# Exhibit F

# Chief Roessler Review of AI Investigation

19-IA-0222
Page 1 of 13

## REVIEW

After reviewing the investigation and the commander reviews, I determined that they did not meet the standard of thoroughness and completeness necessary to reach an appropriate conclusion in this matter. Of note is the decision-making process during the investigation and review was clearly impacted by questions which allowed for answers of hindsight by both Ms. Omeish and PFC Patrick. Additionally, the in-car video (ICV) of Ms. Omeish's interaction with a Virginia State Trooper appears to me to have factored into or biased the review process. The issue to be determined is whether PFC Patrick violated Department policy and training in not employing any forms of de-escalation tactics when dealing with Ms. Omeish, to include ignoring her repeated effort to comply with his commands. Based upon my review, I have concluded that PFC Patrick was in violation of General Order 540.2 – Use of Force, §1 – A&B. In arriving at my conclusion in this matter, I have considered that the reviewing commanders all noted that based upon PFC Patrick's actions during the traffic stop and his responses to interview questions that he needed additional training in de-escalation techniques, as he failed to follow appropriate Department policy and training.

My determination in this matter is based upon the facts of PFC Patrick's ICV and its transcript, coupled with his responses to questions during a pre-disciplinary hearing. I evaluated all these factors with the elements of our de-escalation policies related to General Order 540.2, the Academy training lesson plans, and PFC Patrick's certification in Crisis Intervention Team training (CIT) derived from the class syllabus. Of importance is the ICV, as it demonstrated to me, a series of cascading deteriorating factors related to PFC Patrick's inability to use de-escalation techniques with a verbally passive resister, who did not pose any factual imminent threat of danger to him.

The ICV also demonstrated that PFC Patrick focused on his lawful authority to arrest Ms. Omeish for her initial questioning of his request for her operator's license versus using the opportunity to deploy de-escalation techniques. It is concerning to me that PFC Patrick clearly reached a "point of no return" in his verbal interactions with a verbally passive resistor who posed no threat of imminent harm to him until he made a decision to enter the vehicle and use physical force. This action then escalated to a higher level of force by his deployment of OC spray to affect the arrest. This arrest, while legally justified, was absent the standards established by Department policy which encourages the use of de-escalation techniques as a means of avoiding physical force and achieving a positive outcome. It is also concerning to me that PFC Patrick continued his efforts to take Ms. Omeish into custody and deployed OC spray after she stated at least 16 times that she would give PFC Patrick her license (see transcript and DVD of ICV).

19-IA-0222
Page 2 of 13

After reviewing the prior findings of the commanders, it is my conclusion that those reviews focused on the application of laws to justify PFC Patrick's actions to make an arrest and they did not discuss whether-or-not he had the ability to use de-escalation techniques in accordance with policies. My decision to overturn the commander's conclusion for General Order 540.2 is based on the factual evidence presented by the ICV, and not based upon hindsight or other suppositions.

I have included below, sections of analysis of time stamps and transcription of the ICV, as well as my conclusions on my ICV analysis.

Analysis of Time Stamps & Transcription of the & ICV

Between the time stamps of 20:06:29 to 20:07:48 there was an exchange of the following statements between PFC Patrick and Ms. Omeish as noted in this visual:

| PFC Patrick | 20:06:29-20:07:48 | 14 times he asked Ms. Omeish to get out of the car |
| Ms. Omeish | 20:06:53-20:07:47 | 16 times she advised regarding her operator's license "I'll give it to you." |

At 20:06:40 PFC Patrick says, "I'm done asking."

At 20:06:43 Ms. Omeish says, "There is really no reason to escalate this."

At 20:06:44 PFC Patrick says, "Step out of the car."

At 20:06:44 Ms. Omeish says, "I would like to report what is going on?"

At 20:06:48 PFC Patrick reaches into the vehicle.

At 20:06:50 Ms. Omeish says, "Sir, I will give you my license" (1)

At 20:06:53 PFC Patrick replies, "No. Out of the car ma'am."

At 20:06:54 Ms. Omeish says, "I will give you my license." (2)

At 20:06:55 PFC Patrick utters, "Ma'am."

At 20:06:56 Ms. Omeish states, "Sir I will give you my license." (3)

At 20:06:57 PFC Patrick replies, "Out of the car."

19-IA-0222
Page 3 of 13

At 20:06:58 Ms. Omeish states, "I'll give you my license. (4) Sir I will give you my license, (5) don't do this, are you serious right now. Sir I will give you my license." (6)

> Note: *The above reply by Ms. Omeish is being made as PFC Patrick is actively attempting to pull her out of the vehicle.*

At 20:07:06 PFC Patrick states, "Out of the car ma'am."

At 20:07:08 Ms. Omeish replies, "I'll give you the license. (7) No, no, no."

At 20:07:15 PFC Patrick states, "Last chance out of the car right now."

The back-and-forth continues as noted in the transcript, and at 20:07:46, PFC Patrick's use of hands-on tactics to extract Ms. Omeish occurs. As the full transcript factually demonstrates, Ms. Omeish stated another 9 times that she would give PFC Patrick her license before he deployed OC spray to gain control of her for his intention of making a physical arrest for what PFC Patrick stated was her refusal to give him her license and registration.

It is clear to me that at 20:06:40, when PFC Patrick says, "I'm done asking" he has reached his predetermined "***point of no return***"[i] in his escalation/de-escalation decision-making process with a verbally passive resister. At this time stamp marker and moving forward in the ICV, we observe factually that PFC Patrick either ignored or did not have the capacity in the situation to hear at least 16 verbal offers of compliance clearly stated by Ms. Omeish where she said to PFC Patrick, she would give him her license.

On its face, PFC Patrick's actions are not proportionate to the situation. The ICV is void of hindsight and does not bias the reasonable objective facts captured visually and verbally. Under the objectively reasonable standard of reviewing this matter, it is not hindsight that I apply, rather it is the digital ICV evidence which is beyond a reasonable doubt. The ICV factually demonstrates that PFC Patrick ignored or somehow missed all offers of compliance, from the first utterance to the sixteenth compliance statement stated clearly by Ms. Omeish before he decided to escalate his level of physical force via the deployment of OC spray to effect an arrest. At no point in time, from PFC Patrick's advising Ms. Omeish she had two choices, do we observe and/or hear PFC Patrick use any form of de-escalation techniques as prescribed in the chapters of General Order 540 – Use of Force & 540.2 – De-escalation, the lesson plans of his training on de-escalation on April 18, 2016, or his completion of CIT training on April 15, 2016.

The investigation and the prior reviews have not satisfactorily answered the decision-making steps of PFC Patrick. Nor did they fully explore other factors, such as his state of mind and his ability to hear the statements of compliance made by Ms. Omeish before force in the form of OC spray was deployed. These are the primary areas that I explore below.

19-IA-0222
Page 4 of 13

There are other matters of the investigation and command reviews that I have also explored. This was done to establish in both the investigation and final review, a level of thoroughness for an appropriate decision to be made by me, as to whether-or-not PFC Patrick's actions were proportionate and in compliance with Department de-escalation policies and training.

<u>Analysis of the ICV & Transcript and Use of Force General Orders & Training</u>

PFC Patrick is duty bound to follow the policies and training of the Fairfax County Police Department which creates a standard to protect all human life and liberties above the requirements of the law. General Order 540 – Use of Force § II. Policy states in part the following related to this event:

> *Force is to be used only to the extent it is objectively reasonable to defend oneself or another, to control an individual during an investigative or mental detention, or to lawfully effect an arrest.*
>
> *Force should be based upon the totality of the circumstances known by the officer at the time force is applied, without regard to the officer's underlying intent or motivation, and weighs the actions of the officer against their responsibility to protect public safety as well as the individuals' civil liberties.*
>
> *Force shall not be used unless it is reasonably necessary in view of the circumstances confronting the officer.*

General Order 540.2, De-escalation states the following:

> *A. De-escalation is the result of a combination of communication, tact, empathy, instinct, and sound officer safety tactics. The ultimate goal is to help achieve a positive outcome by reducing the need for force.*
>
> *B. When possible, officers should seek to utilize de-escalation strategies to prevent situations from deteriorating to the point where they would need to use force. Officers should attempt to gain voluntary compliance and reduce the level of force required in a situation through verbal communication efforts. When force is applied, officers will adjust the amount of force used to overcome an individual's resistance and to gain control.*

One of the issues not fully explored in the investigation and the command reviews was PFC Patrick's ignoring all of Ms. Omeish's statements of compliance to his request for her license and/or registration. One is left with the following questions after reading the investigation and command reviews:

- Did PFC Patrick hear Ms. Omeish on the first utterance of compliance?
- Did he hear the other subsequent offers of compliance which are clearly captured on the ICV?

19-IA-0222
Page 5 of 13

The ICV demonstrates PFC Patrick developing his predetermined point of no return to make a decision to arrest through his statement informing Ms. Omeish she had two choices. The ICV does not provide any evidence that PFC Patrick used or attempted to use any de-escalation techniques as evident by his statements. His decision-making process is clearly understood by his statement of, "I'm done asking." Additionally, during the administrative investigation, PFC Patrick, in explaining his mindset regarding the arrest, stated to the investigator that he had, "already asked her twice for her license and/or registration and that's enough." This is PFC Patrick's statement of fact as to his justification for using force, but the investigation stopped short of understanding why PFC Patrick did not revert to any de-escalation techniques as mandated when Ms. Omeish made the first utterance that she would comply by stating she would give her license to him.

It's critical to understand that at the below time marker, the following was stated by PFC Patrick:

> 20:06:40 PFC Patrick says, "*I'm done asking.*"

The ICV does not present any evidence to demonstrate that PFC Patrick was in a situation of imminent threat of harm. It also establishes that he failed to use any tactics to de-escalate the situation after the first and subsequent statements of compliance were made by Ms. Omeish in accordance with General Order 540.2 and his training requirements.

As stated, the ICV captured at least 16 offers of compliance by Ms. Omeish, Despite this, PFC Patrick continued to escalate his use of force decision-making process from verbal, to body language, to the physical action of opening the door to that of hands-on tactics, and finally to the deployment of OC spray. During this time, Ms. Omeish was attempting to verbally de-escalate the situation by stating she would give PFC Patrick her license.

Conclusion(s) of Analyses

My review has determined that all the de-escalation policies and training requirements (as noted above) derived from the CY2016 re-engineering of the Fairfax County Police Department's use of force policies and training are applicable to this matter. I have also determined they are accepted best practice policies and training endorsed by the Commission on Accreditation for Law Enforcement Agencies, the Virginia Law Enforcement Professional Standards Commission, the Police Executive Research Forum, the International Association of Chiefs of Police, the President's Task Force on 21st Century Policing, and the Fairfax County Ad Hoc Police Practices Review Commission.

19-IA-0222
Page 6 of 13

The re-engineering of our use of force policies adopted the National Decision-Making (NDM) model and we have trained (and continue to train on an annual basis as mandated by me) all officers on how to use de-escalation techniques in a variety of situations including hostile situations where a person is armed with a weapon and other situations where the person is verbally resistant and/or not understanding the officer. Our continuous training on the NDM model and policies is given to all recruits in training, at annual in-service training, and across all we train.

Our use of force policies (and many other polices) hold us to a higher standard than most of the prevailing laws and professional association policy recommendations in our efforts to make safely informed decisions to either use force or use other de-escalation tactics in an attempt to avoid using force, when possible.  All reviews of the use of force against these policies strictly adheres to laws which prevent hindsight to creep into any analysis of compliance after the event happens. As an agency we hold ourselves accountable for all use of force matters as they are all subjected to prescribed reviews and investigations.  The purpose of all reviews and investigations is to make certain we are using force proportionately, legally, when it is necessary, and ethically.  To ensure hindsight was not used in my review, the ICV and its transcript of the verbal interactions was used first.  Then a pre-disciplinary hearing was held to allow the employee to provide answers to my questions from my investigative review in order for me to conduct the analysis for a decision as to whether-or-not there was compliance to policies and training.

When viewing the ICV for policy compliance in its totality for the complaint received and for the policy driven mandate to review all uses of force incidents, we do observe PFC Patrick asking the driver if she knew why he stopped her. Ms. Omeish's response to PFC Patrick's question of "Did you make a stop before making a right-hand turn on a red light?" was, "I think so." A few moments later, PFC Patrick asks Ms. Omeish, "Do you have your license and registration ma'am." Ms. Omeish replied, "**I don't know what I did wrong.**" PFC Patrick then explained the violation. Ms. Omeish then states, "**I, I, I don't think that is true.**" PFC Patrick then states, "Ok, well do you have your license and registration ma'am?"  This is the point in time where PFC Patrick has now only **asked twice,** and the facts are that Ms. Omeish's verbal replies and/or comments were simply questions. There are absolutely no statements made or other facts that a reasonable person can construe that Ms. Omeish was refusing to give PFC Patrick her license and registration at this point. We also observe factually the ICV does not offer any statements made by Ms. Omeish that could be misconstrued and/or rationally developed into refusal statements.  Rather, **we have a driver questioning the officer in conversation.**

Next in the volley of conversation between PFC Patrick and Ms. Omeish, there is a third statement by PFC Patrick of, "Ma'am are you going to give me your license and registration or not?"  There is no audible reply by Ms. Omeish and we then hear PFC Patrick state, "**Alright step out of the vehicle please, step out. Step out of the car.**"

19-IA-0222
Page 7 of 13

The conversation goes on in its volley pattern of questions from Ms. Omeish to PFC Patrick about what she did and other statements **about how he is talking to her** and then PFC Patrick states, "Ma'am, I've been polite and you're going to **argue** with me about it. **I'm giving you two options**." The Internal Affairs investigation revealed through PFC Patrick's statements that he developed a perception in which he concluded the verbal exchange with Ms. Omeish was that of an argument. The ICV demonstrates Ms. Omeish was questioning PFC Patrick about the traffic stop.

An analysis of the ICV at this point indicates:

- We have a driver questioning the officer.
- We have absolutely no statements of refusal to provide a license and registration made by the driver.
- Ms. Omeish states in the beginning, **"I don't know what I did wrong."**
- The officer gave the driver two options without demonstrating any de-escalation techniques during the conversation.

After more volleys of discussion, PFC Patrick escalates the conversation, instructing Ms. Omeish with the following, "...**Ma'am if you do not exit on your own, I'm going to have to remove you from the car. Step out of the car**." Again, Ms. Omiesh has not made any refusal statements and she replies to PFC Patrick, "**Sir, there is no need to escalate this, I'm going to record this right now**." At this point, Ms. Omiesh started to record the traffic stop using her hands to activate her cell phone which was clearly visible to PFC Patrick, as in the beginning of the traffic stop he states, "Nope, you didn't even slow down when you made the turn ma'am and then I get up here and you're texting on your phone." This demonstrates PFC Patrick sees the driver's hands and the investigation does not develop any facts that Ms. Omiesh was an imminent threat of harm to PFC Patrick.

With the facts of the above paragraph we clearly hear PFC Patrick escalate the situation without any statements of refusal to produce a license and registration by Ms. Omeish. PFC Patrick stated:

- "...**Ma'am if you do not exit on your own, I'm going to have to remove you from the car. Step out of the car**."

This statement demonstrates PFC Patrick's decision-making process has caused him to reach a pre-determined point of no return as he committed to his decision to use physical force to end the conversation rather than use any forms of mandated de-escalation techniques.

19-IA-0222
Page 8 of 13

Furthermore, it's troubling that the investigation reveals PFC Patrick's justification to make a physical arrest was based upon his interpretation of the Obstruction of Justice law as applied to the totality of the chain of events leading to the point of PFC Patrick saying, "I'm done asking." This statement demonstrates he cemented his actions even earlier than ordering her to exit the car and the investigation leads one to conclude that such decision-making was based upon PFC Patrick's perceptions that Ms. Omiesh was <u>refusing</u> to furnish her license and registration. He then applied these perceptions to the law to make a physical arrest and resorted to the deployment of force without any consideration of his obligations to the Use of Force General Orders and our de-escalation policies which are required when there is no imminent threat of harm.

Additionally, the investigation does not provide any supporting evidence or statements made by either party that PFC Patrick was in a state of imminent harm. However, I do concede (that after the many statements of compliance by the driver) we can agree that (as depicted on the ICV and through the investigation) once PFC Patrick went into the car to grab the driver, who was trying to move toward the passenger door to avoid the physical arrest, PFC Patrick could reasonably conclude harm could come at that point. However, this review and the pre-disciplinary hearing is focused on the requirements within General Order 540.2 to use de-escalation techniques in response to the statements of compliance by Ms. Omeish prior to any physical use of force by PFC Patrick.

**Pre-Disciplinary Hearing**

On January 6, 2020, at 1930 hours, a pre-disciplinary hearing was held in my office and present was PFC Patrick, Lieutenant Hines, and Major Owens. During the opening of the hearing the following was explained to PFC Patrick by me:

> *The reason why I am conducting a pre-disciplinary hearing is not that I've decided right or wrong; rather, during the review of this investigation I determined it was not a thorough investigation as both the investigation and the commander reviews did not explore fully the obligations of the chapters of Use of Force: particularly General Order 540.2 §1 A&B De-escalation, and your mandated de-escalation training, coupled with your certification as a CIT officer.*
>
> *The <u>purpose</u> of this hearing is to allow you to understand the findings of the investigation which will be proffered by Lieutenant Hines. After Lieutenant Hines concludes I will ask you formatted questions and when done I will excuse Lieutenant Hines and I may ask you follow up questions based upon the facts of the in-car video.*
>
> *There shall be no formal rules of evidence in the pre-disciplinary hearing.*

19-IA-0222
Page 9 of 13

I then read him guidelines used for the conduct of the meeting.

When I asked PFC Patrick if he understood what I just stated and/or had any questions he advised that he, "did not understand why he was in my office because the Lieutenant said I was good to go." When I asked him who this Lieutenant was, he said, "Tucker." After re-explaining myself with the above description of the purpose of the hearing, PFC Patrick then acknowledged the purpose of the hearing. Lieutenant Hines then provided an oral briefing of his investigation and his findings. PFC Patrick was then asked the following questions with his corresponding responses as follows:

1. Are there any other witnesses to this incident that should be interviewed?
   Answer: "None that I am aware of, sir."

2. Are there any other investigative steps which you feel should be taken to obtain all the relevant facts surrounding this incident?
   Answer: "None that I am aware of, sir."

3. Do you have any concerns about the conduct of the investigation?
   Answer: "No, sir."

Next, I explained to PFC Patrick I would play the ICV to the point of where he resorted to the deployment of OC spray. I asked PFC Patrick if he had observed the ICV and he acknowledged he observed it in the past and was familiar with it.

After the ICV was stopped, I discussed how our de-escalation policy (which I read in its entirety) in General Order 540.2, coupled with its training lesson plan, reminds us that there is no such thing as a routine traffic stop.

When I asked PFC Patrick how and why, and at what point did he arrive at his decision to go hands on and arrest Ms. Omeish for Obstruction of Justice, PFC Patrick stated to me that he, "**gave her two options and it was clear she did not understand the ramifications once he opened the door, as she refused to give me her license**." At this point in the discussion I pointed to the fact that Ms. Omeish <u>never</u> made any statements of refusal as she just questioned PFC Patrick why she was stopped, and once he stated to her the two options she had, she also questioned him regarding his option statements. PFC Patrick responded to me stating that, "**She understood the ramifications with the two options numerous times**." When I asked PFC Patrick how he knew what Ms. Omeish was thinking beyond her actual statements she made; and/or what was his ability to know if she understood everything; he had no plausible answer(s) to respond to my question(s).

19-IA-0222
Page 10 of 13

Next, I explained the facts of the ICV were not hindsight and the ICV demonstrates that Ms. Omeish can best be described as a verbally passive resister as she questioned PFC Patrick on the majority of his statements and the evidence shows that she never made any statements of refusal to furnish her license and registration. I then read the transcript of the ICV for PFC Patrick to factually point out that Ms. Omeish never made any statements of refusal.

PFC Patrick was then asked to describe his tone of voice, his listening skills, and the safety conditions during the traffic stop. PFC Patrick said, "It was noisy due to the traffic and I was being polite." I then asked PFC Patrick to describe to me exactly what was the threat of harm that Ms. Omeish was posing to him. He was not able to articulate to me any facts of how Ms. Omeish was a physical threat of harm to him and his only concern was that he, "**Did not know who she was, and I had already asked her twice for her license and/or registration and, that's enough**." It's important to note that during the investigation, as depicted in the ICV transcription, and through PFC Patrick's own words, it's clear that Ms. Omeish had her cell phone in her hands and she was observed both texting and then putting her camera function on when she told PFC Patrick that she was going to record.

I asked PFC Patrick again to describe what harm Ms. Omeish was posing to him and PFC Patrick replied, "**There was no threat to me**" and then he re-explained her "**refusal**" to give her license.

At this point of the hearing, I again re-explained our prior discussion about Ms. Omeish presenting as a verbally passive resister and then I directed the conversation to the question of PFC Patrick's listening skills as I reminded him that at least 11 or more times from his opening of the car door and to the point of going into the car prior to deploying OC spray, you can clearly hear Ms. Omeish make statements that she would give him her license and one statement where she advised he does not need to escalate this. I then asked PFC Patrick if he heard all of this. PFC Patrick at first was silent and had no immediate reply. <u>I then asked him if he heard the first statement of compliance made by Ms. Omeish where she said she would give him her license and his response was</u>, "**I can't recall**."

Next, I again read General Order 540.2 and then asked PFC Patrick to factually explain to me his tact, empathy, and sound officer safety techniques based on either his recollection and/or if he needed to, he could use the ICV to answer my question(s). PFC Patrick responded by discussing how Ms. Omeish had a cell phone in her hand which was toward his face and she was going away from him while he went into the car. Upon hearing his reply, I then explained to PFC Patrick that factually, the ICV does not demonstrate to me that he used any of the requirements of de-escalation as described in General Order 540.2 or of any requirements in the training he has received, and I was not hearing him articulate any de-escalation techniques in his answers which specifically demonstrate compliance with the components of General Order 540.2.

19-IA-0222
Page 11 of 13

Based upon PFC Patrick's responses to my questions at this point in the hearing, I asked PFC Patrick if he ever thought of using any de-escalation techniques as required of all sworn officers in accordance with General Order 540.2 and he replied he, "**Had no reason to believe a need to de-escalate as <u>she was still refusing</u> and was still trying to get further away in the vehicle.**" I then re-directed PFC Patrick to the moment before he attempted to go hands-on to arrest Ms. Omeish and asked him again whether-or-not he heard the first statement of Ms. Omeish where she advised she would give him her license, and the subsequent offers of compliance before he deployed OC spray. PFC Patrick's reply was, "**Twice was enough.**"

The review I conducted, and the analysis of the findings of the pre-disciplinary hearing, demonstrate the following facts that PFC Patrick:

- Never articulated any factual imminent threat of harm to himself presented by Ms. Omeish.
- Never used or thought of using any de-escalation techniques required of him by all prevailing policies and lesson plans related to his training.
- Could not describe any factual acts or statements where Ms. Omiesh actually refused to provide her license and registration.
- Doesn't recall ever hearing Ms. Omeish's first and subsequent verbal statements where she offers her compliance ("I will give you my license") and he proceeds to escalate his levels of force.
- Made a decision to arrest Ms. Omeish based upon his perceptions (not facts) from a conversation with Ms. Omeish that she was refusing to present her license and registration. To the contrary of his self-described perceptions of Ms. Omeish's "refusal" to provide her license and registration, the facts of the ICV demonstrate that Ms. Omeish was simply questioning the traffic stop and never made any refusal statements or any implied statements of refusal that would lead a reasonable person to conclude that she refusing. Rather the facts beyond the preponderance of evidence demonstrate that Ms. Omeish was simply using a verbal form of conversation related to why she was stopped and challenging PFC Patrick's demeanor and overall customer service as she was not understanding the reasons "why" as related to PFC Patrick's actions.

General Order 540.2 – De-Escalation; was promulgated in calendar year CY2016 through initial in-service training by the Criminal Justice Academy to make certain that "*when possible, officers should seek to utilize de-escalation strategies to prevent situations from deteriorating to the point where they would need to use force.*" Our de-escalation training continues to be an annual mandate since CY2016.

19-IA-0222
Page 12 of 13

PFC Patrick uses default statements throughout this investigation and during the pre-disciplinary hearing which are summarized in totality as he, "**had already asked her twice for her license and/or registration and, that's enough**" as justification for his use of force actions. The facts of this investigation and the pre-disciplinary hearing demonstrate there was no imminent threat of harm posed to PFC Patrick prior to trying to go hands on to arrest Ms. Omeish. Additionally, PFC Patrick's response during the pre-disciplinary hearing to the question of whether-or-not there was a threat of harm posed to him by Ms. Omeish was, "**There was no threat to me**." Furthermore, PFC Patrick cannot recall Ms. Omeish's offers of compliance either the first time or the subsequent times that she offered compliance, prior to his deploying OC spray. These facts coupled with his statement to Ms. Omeish, "**So you can either give me your license and registration or you can step out and I can take you to jail and we'll be done with this, your choice**" demonstrates that PFC Patrick was already pre-disposed to make an arrest with the use of force. PFC Patrick's decision not to use any forms of de-escalation techniques, as required of him in this situation, one of no threat of imminent harm, factually demonstrate his *"point of no return."* We observe PFC Patrick escalate the matter from a discussion to his choosing to escalate his levels of verbal commands, to attempting to go hands-on (opening the driver door and then going into the car to grab the driver), and then to deployment of OC spray in order to execute a predetermined decision to make a physical arrest based upon his inaccurate perceptions of Ms. Omeish's refusal to furnish her operator's license and registration.

The ICV also demonstrates Ms. Omeish stating, "**Sir there is no need to escalate this....**" Ms. Omeish is a community member not trained in General Order 540.2 who attempts to de-escalate PFC Patrick's verbal communications and his response was, "**step out of the car.**" On the ICV we see factually, evidence of PFC Patrick's cascading-deeper dive into his point of no return as he made a pre-determined decision to escalate his force continuums while ignoring the policies and training required of him to de-escalate the situation with a person who was simply questioning him in conversation style, making absolutely no statements of refusal to provide her driver's license and/or registration, not posing any imminent threat of harm to him, and offering multiple clear offers of compliance to give him her license.

PFC Patrick missed all of the opportunities required of him to use de-escalation techniques from the first time Ms. Omeish stated, "I will give you my license" and to the last time she made a compliance statement before he deployed OC spray. Specifically, PFC Patrick never demonstrated the required use of a combination of communication, tact, empathy, instinct, and sound officer safety tactics to de-escalate the situation. Rather, PFC Patrick used his "instinct" to interpret his perceptions that Ms. Omeish's statements in the conversation were one's of "refusal" when they were not such. PFC Patrick defaulted to the use of a law and a flawed decision-making process not in sync with our policies and training to come to a conclusion that asking her twice was enough, and this rationale caused him to make an inappropriate decision to move forward with a physical arrest by escalating his levels of force. The decision-making process used by PFC Patrick to use force was not proportionate for the totality of the facts of this traffic stop.

19-IA-0222
Page 13 of 13

_____
Colonel Edwin C. Roessler Jr.
Chief of Police

January 30th, 2020
Date

### ACTION TAKEN

PFC Patrick's decision-making to use force in this matter was not proportionate to the facts of Ms. Omeish's offers of compliance, as he failed to use any de-escalation techniques required of him by policies and training as described in the sections above. Therefore, this case shall be classified as follows:

- Regulation 201.3, Obedience to Laws and Regulations as it pertains to General Order 540.2, Use of Force, §1 – A&B: **SUSTAINED**

On January 30, 2020, an Oral Reprimand was administered for discipline in this matter.

The other components of this investigation shall be classified as follows:

- Regulation 201.3, Obedience to Laws and Regulations as it pertains to General Order 540.13, Empty-Hand Tactics: **IN COMPLIANCE**

- Regulation 201.3, Obedience to Laws and Regulations as it pertains to General Order 540.14, Oleoresin Capsicum: **IN COMPLIANCE**

- Regulation 201.22, Bias Based Policing: **UNFOUNDED**

---

[i] The "point of no return" terminology is derived from Graham v. Connor as it relates to the objective reasonableness standard. Based upon General Order 540.2 and associated training syllabuses; officers are required, when possible, to base their actions on the National Decision Making model process wherein their decision-making is flexible when conditions support, to de-escalate and escalate based upon the given situation, and to ensure their use of force is proportionate, legal, accountable, necessary, and ethical based upon the presentation of an imminent threat of harm or not. Furthermore, besides the factors above; "the point of no return" in law enforcement decision-making describes the fact that an officer already made their decision to move forward with their objective to either escalate or de-escalate. This decision-making process is evaluated administratively without being subjected to hindsight as required by Graham v. Connor to draw a factual conclusion.